(No. 5080. October 2, 1930.)

BLAINE COUNTY INVESTMENT COMPANY, a Corporation, Respondent, v. ROBERT G. MAYS et al., Appellants.

[291 Pac. 1055.]

F. J. Cowen, for Appellants.

768

Wm. Story, Jr., and Peterson, Baum & Clark, for Respondent.

GIVENS, C. J.—This action was commenced by respondent to quiet title to certain waters of Little Lost River claimed by it. Various water users of Little Lost River or its tributaries, other than the original defendants, were joined so the action has become in effect an adjudication of all the water rights upon Little Lost River and its tributaries. Honorable L. E. Glennon, an attorney of this court, was appointed referee and held numerous hearings. After a preliminary report of the referee was tendered, hearings were had upon it, arguments made, further evidence taken and then a final report submitted which in turn was argued before the court who thereafter entered a decree based in the main upon the final report of the referee. It is apparent the referee, the learned trial judge and the attorneys gave the entire controversy their most painstaking, careful and studied attention.

The earliest appropriations of water for irrigation on Little Lost River date from 1879. The respondent is a Carey Act segregation of originally some 15,000 acres; only 7,500 have been reclaimed and irrigated. The two principal water rights of the respondent, about which the chief controversies in this action revolve, are two permits numbered 1119, dated January 23, 1905, for 12 second-feet, and 3399, dated January 8, 1908, for 145 second-feet. These permits came by mesne conveyances to respondent. The theory of these permits, as finally evolved, was the construction of a reservoir on Dry Creek and the conveying of the stored water thereof and some of the natural flow of said stream through a pipeline and the natural channel of Corral Creek to Wet Creek, thence into Little Lost River and down the same to the points of distribution.

Dry Creek in its original state flowed only occasionally and at high water into Little Lost River, and it was thought

that there was therein an excessive stream-bed loss which would in large part be corrected by such diversion. Prior to these permit appropriations certain early settlers, whose interests are now held by Perry Basinger, O. P. Williams, the Williams Estate, E. B. Jones and others, having appropriations out of Dry Creek, had constructed what is known as the Farmers' Canal from Dry Creek to Wet Creek, along an elevation below the pipe-line and Corral Creek. This was done for the purpose of saving water and conveying it more directly to their respective places of use. This canal was constructed about 1891 to 1893. The two permits now belonging to respondent above mentioned were not in effect until after 1905. After the Farmers' Canal was constructed, but before respondents had completed their operations, J. B. Taylor and Samantha Taylor acquired certain rights in Dry Creek for irrigation purposes and domestic use, their farm lying approximately at the place where the Farmers' Canal was taken out of Dry Creek. When the respondents constructed their pipe-line they entered into an agreement with the users of the Farmers'. Canal whereby it was agreed that the company would carry the water of the users of the Farmers' Canal through the pipe-line, it being the theory and purpose of the company that there would then be a saving of water otherwise lost in seepage between the intake of the pipe-line some miles above the intake of the Farmers' Canal and the outlet of the Farmers' Canal into Wet Creek, and that this saving would be available for the respondent company. Respondent's reservoir has always lost a considerable amount of water by seepage and percolation. The reservoir as finally constructed, with a dam eighty-five feet in height, was designed to store some 5,000 acre-feet of water. It has never been possible to hold that amount of water in the reservoir. The reservoir is filled twice during any one year; the water first stored during the late fall and winter is used by the company for early spring irrigation. The reservoir is again filled to the extent possible by the spring run off which generally occurs along between March and June. The water thus stored is used for summer consumption.

Appellants claim that the work under these two permits was not done within the time prescribed; that a quota of work only sufficient to prove up on one permit was used as proof for both permits; in other words, as they express it, the proof was pivoted, and the rights claimed under these permits and appropriations were lost because not asserted in previous litigation resulting in decrees previously rendered and adjudicating the waters of Little Lost River.

There is in the record a judgment-roll of the adjudication of the waters of Little Lost River ending in a decree rendered in 1901. Therein, but without any further pleadings, record or files in connection therewith, or without any explanation in the record, appear findings of fact and conclusions of law and a decree dated 1907 in an action evidently including the same parties. The burden of proof was upon the appellants to show a former adjudication, and this record is insufficient to show either that there was such a disposition of the rights of the parties under these two permits or that the rights thereunder should have been litigated so as to make these decrees, without having passed upon these permits, adversely binding upon the respondent herein. Unless, therefore, the water decreed under No. 3399 was excessive in amount, the court properly found in favor of respondent in connection with these permits. The question of whether the award was excessive will be further considered in connection with the duty of water, and the question of whether or not any water has in fact been conserved by respondent's activities on the stream.

It is also contended that the awarding of 600 inches with a priority of January 23, 1905, under permit 1119, was prejudicial to the Little Lost River Land and Livestock Company which was given a priority of June 1, 1905, for 280 inches. While conflicting, the evidence was sufficient to sustain the finding and conclusion of the referee and trial court, that the work under this permit had been done in time and that respondent's rights thereunder had not been lost; the determining of these relative priorities was therefore not incorrect. *Syster v. Hazzard*, 39 Ida. 580, 229 Pac. 1110, holds

that where permits have been transferred from one party to another each successive holder has the original time within which to complete the work. Under the doctrine of this case the referee and the court were justified from the evidence in holding that the work necessary to comply with the requirements of the statute, in connection with these permits, was completed within the required time.

As the water flowed down Dry Creek prior to the construction of respondent's reservoir and the diversion of water from Dry Creek through the company's pipe-line from Corral Creek to Wet Creek, there was sufficient water either flowing in Dry Creek or rising in springs above their place to supply the irrigation rights of J. B. and Samantha Taylor, and also to furnish an underground flow of water sufficient through springs and wells to furnish them with a domestic supply throughout the year. It is their contention that the diversion from Dry Creek has affected the surface flow as well as the subsurface flow of this stream so as to deprive them of both irrigation and domestic water.

There evidently had been more or less trouble and difficulty between the Taylors and the users of the so-called Farmers' Canal and Dry Creek over this same question, although in a less degree, for some years, and it was perhaps, in part at least, to avoid this continued trouble that the users of the Farmers' Canal entered into the agreement above referred to. The Taylor rights have been twice before this court and unquestionably they have been adjudicated, so as to be binding on all parties herein. (*Basinger v. Taylor*, 30 Ida. 289, 164 Pac. 522; Id., 36 Ida. 591, 211 Pac. 1085.) The referee and the court found that the Taylors were entitled to this water so decreed. The conclusion affirming this right is perhaps not quite in harmony with the finding. The Taylors further contend that in connection with the showing of saving urged by the company, there was considered to be a loss of 273 inches between the intake of the pipe-line and the diversion point of the Farmers' Canal, but that this ratio of loss was not used in determining what extra waters should

be allowed to flow down the stream to compensate for stream losses in filling their (Taylors') rights.

It is urged on the other hand that the original losses were excessive and that the Taylors have no right to insist upon a continuation of such a condition, even though such flow in the stream at the entrance of the pipe-line was necessary to adequately and completely fill their rights, both domestic and irrigation. The Taylors also contend that they have a right to a flow of the stream sufficient to supply their irrigation appropriation for the entire year, in order that they may overflow their lands, the water freezing and forming an ice cap, sometimes to a depth of several feet, which the Taylors claim is very beneficial in that the moisture is retained by the soil into the summer, greatly aiding plant growth. This claimed beneficial use was disputed by the respondent and at least not acquiesced in by any other appellant, and the referee and the court found that such use was not a beneficial use. The evidence being conflicting but sufficient, this conclusion of the referee and the court is sustained.

On the other hand, since the Taylors' rights to irrigation water during the regular irrigation season and for domestic use throughout the year antedate respondent's rights, we believe that the condition of the stream, so far as it affects the supplying of their rights, should be retained substantially as it was before the construction of respondent's reservoir and the diversion of the Dry Creek water through the pipe-line, or their rights otherwise fully protected; and the finding and conclusion with regard to the Taylors' rights should be so amended or supplemented.

The users of water through the so-called Farmers' Canal and their predecessors in interest under the contract contend that their water was to be delivered undiminished through the pipe-line, at their respective points of diversion. The company on the other hand contends that under this agreement it was to supply merely these rights as they formerly existed where the canal emptied into Wet Creek. The users of the Farmers' Canal have 22 second-feet; to

supply this at the mouth of their old ditch at Wet Creek requires 49 second-feet at the intake of the pipe-line. The company's contention results in this situation: that when the natural flow of Dry Creek falls below 49 feet at the intake of the pipe-line the rights of these users should be proportionately decreased. The contract is not certain on this point and the referee heard evidence *pro* and *con* as to the intention and understanding of the parties at the time the contract was made, and the practical construction placed thereon by the various water-masters over a period of years.

The appellants also offered evidence to the effect that a subsequent contract more clearly stating the situation with regard to this matter had been made. The evidence of the subsequent contract was so unsatisfactory that the referee found no subsequent contract had been made, and in this finding we believe he was clearly justified. The contract as introduced does not indicate that it was the intention of the parties that the users of the canal should receive through the pipe-line more water than they had theretofore received through their ditch. They were relieved from the necessity of keeping up the canal, which apparently had been very expensive. They were also freed from their controversy with the Taylors. This would have been a sufficient consideration for them to make the contract and to permit the diversion of the Dry Creek water saved by the pipe-line, otherwise lost if diverted down Dry Creek and through the canal. Under former conditions, if less than 49 second-feet was flowing in Dry Creek at the point of intake of the pipe-line, clearly the canal users would have received less water, proportioned at least approximately as 22 is to 49; and we believe the referee and the court were justified in placing this construction upon the contract and so awarding the relative rights.

Between the intake of the pipe-line and the mouth of Corral Creek where it flows into Wet Creek is a fall of from twelve to fifteen hundred feet. It is appellants' contention that the diverted waters of Dry Creek in flowing down this steep channel in Corral Creek, a much greater amount

than the natural flow of Corral Creek, which was only a small stream, has washed out silt, sand and gravel, which has in part been deposited at the outlet of Corral Creek and Wet Creek and there spread out, increasing the seepage losses; also that some of this silt, sand and other debris has been carried down into the main channel of Little Lost River and there deposited in such a way as to fill up the channel, causing the continued oncoming waters, particularly during the winter season when it appears that the water freezes in the river, to flow out on the surface of this ice and again freeze, and this repeated process to cause the water to overflow the banks, and spread out on to various ranches, depositing in turn silt and sand upon these lands and at the same time flooding the ranches, barnyards and in a few instances the cellars and houses. In this connection certain of the appellants sought injunctions to restrain the respondent from continuing to so use the channel of Corral Creek, etc.

While under the statute (C. S., sec. 5560) a water appropriator may make use of a natural channel for the conveyance of water, such user is responsible for any injury resulting from the negligent or unlawful use of such channel. (*Larimer & Weld Irr. Co. v. Walker,* 65 Colo. 320, 176 Pac. 282.) The court found that the Dry Creek water so flowing down Corral Creek had carried debris, silt, sand and gravel into the lower streams but that the same did not exceed the natural and proper use of the stream. In other words, we take this finding and conclusion to be to the effect that respondent had not been causing an excessive amount of such debris to be carried down. The evidence showed without real conflict that all the tributary streams naturally carried some silt, sand, etc., which was deposited in and along the river, and that in some measure this was beneficial in refertilizing the lower lands and silting the streams against loss by seepage and percolation. To determine the exact line of demarcation between that which was natural and justifiable and that which was excessive in the carrying of such silt, etc., would be difficult. The referee and the court fur-

ther indicated that to grant an injunction would be such a drastic measure against the company as not to be justified. On the other hand the rights of the parties whose lands were overflowed, if by unreasonable use of the stream channels by the company so that an excessive amount of silt was washed and carried down, may not be disregarded; and while the evidence would not justify an injunction restraining the respondent from the use of Corral Creek and Wet Creek, in conjunction with their pipe-line, for conveying the waters of Dry Creek, we believe the evidence does justify and demand an injunction, at the instance of the appellants complaining, against such use of these channels as will continue hereafter to wash down an excessive amount of silt, sand, gravel, etc., and to further fill up the stream-beds, thus causing the winter overflow to spread on to the farms of Roy Hawley, Howard Hawley and James D. Little.

Respondent claims to have conserved water by one other source. A number of years before the respondent made its filings certain appropriators had constructed out of Saw Mill Creek, a tributary of Little Lost River, a canal north of and paralleling the course of Saw Mill Creek but somewhat straighter and confining the flow of water to but one channel, which was designed to save water of Saw Mill Creek otherwise lost by seepage and percolation. The respondent company conceived the idea of conveying the waters of Saw Mill Creek by a canal lying south of Saw Mill Creek to Summit or Pass Creek to Little Lost River. The respondent company constructed this canal and conveyed through it their own appropriated waters of Saw Mill Creek, as well as the water belonging to these previous users. It is respondent's contention that this ditch saves more water than the Farmers' Canal and that both the works constructed by it on Dry Creek and Wet Creek have saved water otherwise lost by seepage and percolation. The appellants contend, however, that the Farmers' Canal saves as much as respondent's Saw Mill Canal and that respondents have merely diverted the waters in both instances from the subsurface flow to the surface flow and that

the subsurface flow originally passed underground to come out again in the lower reaches of the river or in springs, seeps or swamps below but adjacent to the mouths of these various contributing creeks or the river. In other words, it is contended that the waters of these streams sank beneath the ground but rose again contributing to the surface channel flow of Little Lost River as well as to the ground water underlying the ranches of the early settlers. Numerous hearings were had upon this matter which is the most important and the most far-reaching question in the case.

Upon the first hearing the referee indicated that the evidence *pro* and *con,* that is, as to whether there was a saving in respondent's ditch over that effected by the conveyance of Saw Mill Creek water through the earlier appropriations so-called Farmers' Ditch, was unsatisfactory, and a special investigation was thereafter made by Mr. Lynn Crandall, an engineer of Mackay, Idaho, at the special request of the referee and the court for this purpose. His investigation indicated that above a certain stage of water or flow in Saw Mill Creek there was an appreciable saving by taking the water through respondent's ditch; but that after the flow in Saw Mill Creek dropped to a certain lower level there was no appreciable difference in the losses in either ditch. Finding VIII is sustained by evidence and we cannot say it is not a correct determination of this phase of the controversy. As to Dry Creek and Wet Creek and the use of the pipe-line in Corral Creek, the court found that there was a saving of 1,000 acre-feet. While there was a conflict in the evidence, and while there has been no thorough, scientific investigation or determination of the condition of the flow of the ground water beneath the tributary streams and Little Lost River itself above or below the valley or above the sinks of Little Lost River, the referee and the court viewed the premises, saw and heard the witnesses, and after a most careful and painstaking investigation arrived at the conclusion above indicated, and we cannot say that their conclusions are not justified by the evidence, since it was imperative that they reconcile the numerous conflicts

in the testimony and in the opinions expressed. (*Hill v. Green*, 47 Ida. 157, 274 Pac. 110.)

The original contract between respondent's predecessors and the Carey Act entryman provided a water right of five-eighths of an inch to the acre. The appropriations found for respondent by the court are approximately an inch to the acre. Appellants contend that the court has no right to make such an award. The total amount attempted to be appropriated by the company, if such rights could be filled, did not exceed an inch to the acre for the segregation. Although but 7,500 acres of the land have thus far been reclaimed, the company's rights have not been forfeited, and therefore, from the record, they still have, within the limits of what would be a reasonable time, opportunity to complete their segregation and supply water to the full 15,000 acres. (*Big Wood Canal Co. v. Chapman*, 45 Ida. 380 at 405, 263 Pac. 45, at 53.) . While the court may not decree more water than is in the stream, the total appropriations awarded respondent have been limited to not exceed 30,000 acre-feet in any one year; and the amounts appropriated, both flow and reservoir, are, in connection with the total acreage, not excessive.

It does not appear that the awarding of more than five-eighths of an inch to the acre may be complained of by appellants inasmuch as those rights prior to the company's rights are not affected thereby and the later rights may not complain since the appropriations were made by the company or its predecessors in interest in connection with the total acreage of the Carey Act tract, and there was evidence justifying the court in making finding number 13, declaring the duty of water to be that of each appropriation rather than so much per acre because of the diversity of conditions.

The diversion works below respondent's dam were so constructed as to furnish those rights prior to respondent's by means of an overflow discharge, and to furnish respondent by means of an underflow or pressure discharge feeding into the canal of respondent company. Appellants allege that

this arrangement tends to favor respondent at the expense of prior appropriators. The referee took the position, which seems to be correct, that the kind of apparatus which the company might use for filling prior rights, if it had the approval of the Department of Reclamation, was immaterial providing the rights were filled. If the company was not supplying prior rights in a satisfactory manner, that was a matter to be remedied by the district court which entered the original decree. These diversion works should, however, be modified so that the fluctuations will fall on the later, not the prior, users.

Certain appellants complain that their points of diversion have been changed by the findings, conclusions and decree herein, thereby imposing upon them the burden of additional transmission losses. There are some ten of these appellants and their points of diversion are fixed generally at the mouth of Saw Mill Creek. In their respective answers and cross-complaints their points of diversion are not definitely fixed at any particular point on Saw Mill Creek or Little Lost River. Of course the mouth of Saw Mill Creek would be the lowest point of Saw Mill Creek. Such point might also be designated as "out" of Little Lost River since Saw Mill Creek runs into Little Lost River. During the trial attention was called to this inexact situation and it was agreed between counsel that the points of diversion as described in the pleadings or as furnished before the findings were made up should be the points of diversion specified in such findings. The record does not disclose any more specific indication of where the original points of diversion were than appear in the pleadings above referred to or in the findings as made. It is impossible, therefore, for this court to determine whether or not the points of diversion have been changed so as to injure the particular complaining appellants.

In 1910 Mr. Chapin, a civil engineer, made certain water measurements on Saw Mill Creek and of the waters running in the Saw Mill Farmers' Canal. He died before the trial herein and his notes were not available. Several in-

dividuals, who were present and in a measure assisted him in making the measurements, were produced as witnesses for the appellants. Objections were made on the ground that their testimony was hearsay. The witnesses could not themselves testify as to what the measurements actually were and appellants have offered no authorities in support of their contention that this evidence was not hearsay. The real question at issue was whether there was a saving in taking the waters of Saw Mill Creek through the so-called Saw Mill Farmers' Canal or through the canal constructed by respondent company and down Summit or Pass Creek to Little Lost River. There was repeated testimony on this situation and a special hearing was ordered upon the matter and a special investigation made by an engineer expressly appointed for that purpose by the court herein. The evidence of Mr. Chapin would have been merely cumulative and remote. The saving in this particular as found by the referee by taking the water through respondent's canal was but slight. Under that finding there was an advantage to all parties. There is sufficient evidence to support this finding and conclusion, and we do not believe that the rejection of the evidence with regard to the measurements, even though erroneous which we do not hold, was prejudicial, which completely disposes of assignment number 16.

The decree should be modified to more adequately protect the Taylor rights, grant an injunction in favor of the two Hawleys and Little, and if it has not been attended to, order an immediate correction of the diversion works to protect the early rights; otherwise the decree is affirmed, each party to pay his or its own costs.

Budge, Lee, Varian and McNaughton, JJ., concur.